

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) WD78334 |
| | ) |
| v. | ) OPINION FILED: October 18, 2016 |
| | ) |
| LEVI SCOTT ELLIOTT, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Benton County, Missouri**
The Honorable Michael O'Brien Hendrickson, Judge

Before Division Four: Mark D. Pfeiffer, Chief Judge, Presiding, Victor C. Howard,
Judge and Gary D. Witt, Judge

Levi Scott Elliott ("Levi")[1] was convicted, following a jury trial in Benton County,

Missouri, of murder in the second degree, section 565.021,[2] armed criminal action, section

571.015, and tampering with a motor vehicle, section 569.080. Levi was sentenced to

consecutive terms of imprisonment of twenty years, five years, and five years, respectively.

Levi raises two claims of error in his appeal. First, Levi claims that the trial court erred in

---

[1] Due to the fact many of the individuals in this opinion share the same last name we use Levi's first name and the first names or full names of other relatives for ease of reference and understanding. No disrespect or familiarity is intended.
[2] All statutory references are to the Revised Statutes of Missouri 2000 as currently supplemented, unless otherwise indicated.

not *sua sponte* preventing the State from entering a *nolle prosequi* and refiling the charges because this deprived Levi of the opportunity to be considered for dual jurisdiction in sentencing pursuant to section 211.073. Second, Levi claims that the trial court erred in overruling a hearsay objection at trial. We affirm.

## Factual Background[3]

The events giving rise to Levi's convictions occurred on the evening of March 24, 2012. In March of 2012, Levi was fifteen years old, and his half-sister, Sierra Elliott ("Sierra"), was twelve years old.[4] Both Levi and Sierra lived with their father, Jim Elliott, and Sierra's mother, Peggy Elliott, in Bolivar, Missouri. The previous month, Jim and Peggy Elliott's older son, Andy Summers ("Summers"), moved out of the house, leaving behind a gun cabinet containing some firearms. The gun cabinet was locked, but the key to the cabinet was located on top of the cabinet. Summers had taught Levi how to shoot the .22 caliber guns for target practice and at the time that Summers moved out of the house, the magazine for the .22 caliber Ruger rifle remained loaded.

On March 24, 2012, around 8:00 p.m., Jim and Peggy Elliott left twelve-year-old Sierra in the care of her brother Levi while they ran an errand. Jim and Peggy Elliott owned a white Ford pickup truck that remained at the house.

Jim and Peggy Elliott returned home in about one hour. When they returned, they noticed that the house was dark and their pickup truck was missing. Jim Elliott entered his

---

[3] We view the facts in the light most favorable to the verdict. *State v. Allison*, 326 S.W.3d 81, 85 (Mo. App. W.D. 2010).

[4] Levi is the biological son of Jim Elliott and Joy Adams. Sierra is the biological daughter of Jim and Peggy Elliott.

home and yelled for his children. He heard moaning coming from the master bedroom where he found Sierra lying on the bed with a gunshot wound to her head. Levi was not at home. Jim and Peggy Elliott called 911, and Sierra was airlifted to the hospital. Sierra did not regain consciousness and passed away the following day. The projectile from the gun that injured Sierra was consistent with a Ruger .22 caliber rifle. There were no signs of forced entry into the home and nothing was missing from the home. Summers's gun cabinet was open.

Video surveillance at the Walmart in Clinton, Missouri showed that Levi parked Jim and Peggy Elliott's white Ford pickup truck in the Walmart parking lot at approximately 9:02 p.m. and walked into the store. Levi remained in the store for approximately two hours. Two Walmart employees testified about speaking with Levi while he was in the store. Nicole Marsh, who worked in the electronics department, received two calls for Levi. She testified that she spoke to a woman who stated she was Levi's grandmother and was frantic wanting to speak with him. She paged Levi's name over the store public address system and identified Levi as the person who responded to the page. Levi told the woman on the phone that he "didn't do anything" and that he did not want his father to know his location. A second call came in from a woman claiming to be Levi's mother. Levi was paged again and he responded. He spoke with the woman on the phone and said he "hadn't done it" and kept telling her not to tell his father his location. Levi also spoke with Walmart employee Vickie Anderson ("Anderson"), who asked him if he needed help. Levi was nervous and said that he was on spring break and was just hanging around. Levi told her that he had been watching movies with his sister. In the

3

conversation, they discussed hunting, and Anderson mentioned to Levi that she had a black Jeep that was parked outside.

Levi also spoke with his step-father Robert Adams ("Robert"), the husband of Levi's biological mother, Joy Adams ("Joy")[5], while at Walmart. Levi told Robert he needed someone to pick him up from Walmart. In a subsequent conversation, Levi claimed that when he was home alone with Sierra, he heard a loud noise from down the hallway. He went to investigate and saw that Sierra had been shot, and a man with a rifle was rummaging through a dresser. Levi claimed that he put on his shoes and fled the scene in Jim and Peggy Elliott's truck. Levi claimed that the man pursued him in a black Jeep for several miles but eventually gave up. Levi then stopped the truck at Walmart because the truck was out of gas.

Joy testified that she received a call from Peggy Elliott the night of the shooting, who told her that Levi had shot Sierra. Joy spoke with Levi while he was at Walmart, and Joy's parents, Levi's grandparents, picked Levi up from the Walmart and brought him to a hotel. Levi told the same story regarding the intruder and car chase with the black Jeep to Joy. When Joy learned the police were looking for her son, she took him to a police station in Kansas City.

**Procedural Background**

Levi was charged on June 13, 2012 with second degree murder, armed criminal action, and tampering with a motor vehicle in the first degree. On July 3, 2013, a motion

---

[5] Again, because Joy and Robert Adams have identical surnames, we will refer to them by their first names. No familiarity or disrespect is intended.

for change of venue was granted and the case was transferred to Greene County, Missouri. On August 27, 2013, the State dismissed the charges and refiled them the same day in Polk County, Missouri.

A jury trial was held from October 27, 2014 through October 29, 2014. At trial, the trial court overruled a hearsay objection to testimony from Jason Trammell ("Trammell") of the Missouri State Highway Patrol. Trammell was allowed to testify that a paramedic told him that blood found on a nightstand near Sierra was the result of an IV inserted by paramedics in treating Sierra. The jury found Levi guilty of the charges against him. At the time of conviction, Levi was seventeen years and eight months of age. Levi was sentenced on January 7, 2015, at which time he was seventeen years and ten months of age. Levi now appeals.

## Analysis

### Point One

In Point One on appeal, Levi argues that the trial court erred in failing to *sua sponte* prevent the State from dismissing the charges against him and refiling the same charges the same day because it deprived him of the opportunity to be considered for dual jurisdiction in sentencing pursuant to section 211.073.[6] Levi argues that had the case not been dismissed and refiled, he would have been under the age of seventeen years and six months at the time he was found guilty and, therefore, would have been eligible for the dual jurisdiction program. Levi argues that this deprived him of due process of law

---

[6] Dual jurisdiction allows the trial court to consider, in sentencing, both the criminal and juvenile codes as to the offender. *See* Section 211.073.1.

5

guaranteed by the Fourteenth Amendment of the United States Constitution and Article I,

Section 10 of the Missouri Constitution.

As no objection to the dismissal was made before the trial court, Levi requests plain

error review of his claim under Rule 30.20.

> Rule 30.20 authorizes this Court to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995) (quoting Rule 30.20). If not, we should not exercise our discretion to conduct a Rule 30.20 plain error review. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. [*State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009)]. "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious and clear." *Id.* (citations and internal quotation marks omitted). In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* at 607–08.

*State v. Flores*, 437 S.W.3d 779, 789 (Mo. App. W.D. 2014).

Levi challenges the authority of the State to dismiss and refile the charges against

him where the dismissal allegedly precluded the court from considering "dual jurisdiction"

in sentencing due to the resulting delay in his prosecution.

6

A *nolle prosequi*[7] is the formal entry on the record that a prosecutor no longer intends to prosecute pending criminal charges against the defendant. *State v. Sisco*, 458 S.W.3d 304, 310 (Mo. banc 2015). It is well-settled that a prosecutor has great discretion in whether to pursue charges against a defendant, which has been codified in section 56.087. *Id*. Section 56.087

> provides that the prosecutor "has the power, in his or her discretion, to dismiss a complaint, information, or indictment, or any count or counts thereof["] without the consent of the court. Unless double jeopardy has attached, a dismissal by the prosecutor will be without prejudice, meaning the prosecutor "has complete discretion to refile the case, as long as it is refiled within the time specified by the applicable statute of limitations." [Section 56.087] "Once a prosecutor dismisses a case without prejudice, a court ... has no authority to convert the dismissal to one with prejudice or to force the prosecutor to trial." [*State v. Honeycutt*, 96 S.W.3d 85, 89 (Mo. banc 2003)].

*Id*.

Levi does not allege any impropriety or defect in the dismissal of the charges against him or their refiling except that the delay caused thereby impacted his right to be considered for "dual jurisdiction" under section 211.073.

Section 211.073.1 provides, in part, that

> [t]he court shall, in a case when the offender is under seventeen years and six months of age[8] and has been transferred to a court of general jurisdiction pursuant to section 211.071, and whose prosecution results in a conviction

---

[7] "*Nolle prosequi*" is Latin for "not to wish to prosecute" and is defined as "[a] legal notice that a lawsuit or prosecution has been abandoned." *State v. Dozler*, 455 S.W.3d 471, 473 (Mo. App. S.D. 2015) (quoting BLACK'S LAW DICTIONARY 1074 (8th ed.2004)).

[8] Levi contends in briefing, not contested by the State, that an offender must be under seventeen years and six months of age at the time of *conviction* in order to be considered for "dual jurisdiction" in sentencing. Levi does not cite any authority supporting this interpretation, and the Court has not located any authority interpreting the age requirement in this manner. A plain reading of the statute would suggest that the offender need only be seventeen years and six months of age when transferred to a court of general jurisdiction in order to be eligible for the program. This reading would make the delay in the prosecution irrelevant. However, as this issue has not been raised or briefed by either party, we need not and do not address this issue in our ruling today.

7

or a plea of guilty, consider dual jurisdiction of both the criminal and juvenile codes, as set forth in this section.

As this Court has explained,

> Section 211.073 gives a court the authority to "invoke dual jurisdiction of both the criminal and juvenile codes," § 211.073.1, in cases involving an offender under seventeen who is transferred to a circuit court of general jurisdiction and whose prosecution results in a conviction. Under section 211.073, the circuit court may impose a juvenile disposition and "simultaneously impose an adult criminal sentence, the execution of which shall be suspended pursuant to the provisions of this section." *Id.*

*State ex rel. Sanders v. Kramer*, 160 S.W.3d 822, 824 (Mo. App. W.D. 2005) (footnote omitted). The decision regarding whether to place an offender under the dual jurisdiction program is a matter for the court's discretion. *Burnett v. State*, 311 S.W.3d 810, 816 (Mo. App. E.D. 2009).

Levi has cited no authority to support his contention that the broad discretion granted to prosecutors to *nolle prosequi* charges, codified by statute as explained *supra*, is limited or can be limited by section 211.073. Levi has not identified any authority in which this Court has found that the prosecutor's broad discretion to dismiss and refile charges prior to trial is limited by anything other than double jeopardy or the applicable statute of limitations. As explained in *Sisco*, the prosecutor has "complete discretion" to dismiss the charges *without the court's consent*, and the trial court does not have the power to force the state to trial. 458 S.W.3d at 310*; see also State v. Honeycutt*, 96 S.W.3d 85, 88-89 (Mo. banc 2003) (reaffirming the broad discretion vested in the prosecutor and stating that her decision on how to enforce the criminal laws are "seldom subject to judicial review"); *State v. Clinch*, 335 S.W.3d 579, 583-584 (Mo. App. W.D. 2011) (holding that this Court does

not have the authority to require the trial court to approve a *nolle prosequi* due to "numerous precedents of this state, including from our supreme court," which grants the prosecutor broad discretion); *accord Doyle v. Crane*, 200 S.W.3d 581, 587-88 (Mo. App. W.D. 2006). Any orders or action taken by the trial court after the *nolle prosequi* has been entered are nullities, as the trial court has lost jurisdiction. *See Dozler*, 455 S.W.3d at 473. Levi has not cited, and this Court has not found, any basis in existing law to support Levi's contention that the trial court had the authority to disallow the prosecutor's *nolle prosequi* of the charges or the refiling of the charges on the basis alleged by Levi.[9]

In the absence of any authority whatsoever to support the limitation of the prosecutor's discretion to dismiss and refile the charges under these facts, under plain error review, we cannot find that facially there has been established any substantial ground for believing that manifest injustice or a miscarriage of justice has resulted, much less that the trial court had any way to recognize and foresee such a future issue at the time of the dismissal such that the court should have *sua sponte* stepped in to correct it. We, therefore, decline plain error review.

Point One is denied.

### Point Two

In Point Two on appeal, Levi claims the trial court erred in admitting hearsay testimony, over Levi's objection, from Missouri State Patrolman Jason Trammell

---

[9] Further, from a purely practical standpoint, it is impossible to discern what the trial court could have done if confronted with such an objection. The trial court was not in a position to know, at the time of dismissal, whether the State intended to refile the charges or if any resulting delay in the prosecution would have any impact whatsoever on Levi's eligibility for dual jurisdiction. Also, see footnote 8.

9

("Trammell"), who was allowed to testify that he was informed by a paramedic that a drop of blood found on a nightstand was caused by the paramedics' attempt to put an IV into Sierra's arm.

Trammell is an investigator with training in blood stain pattern analysis and crime scene reconstruction. Trammell testified at trial that no DNA from Sierra was found on the clothing Levi wore the day of the shooting and none was found on the clothing Levi was wearing when he was taken into custody by law enforcement. In addition, Trammell testified that no DNA from Sierra was located in the truck driven by Levi the night of the crime. Sierra's blood was found, however, on a nightstand located near where investigators concluded the shooter was standing when he shot Sierra.[10] The defense argued that Levi could not have been the shooter, as no blood spatter was located on any of his clothing or in the truck that he drove away from the scene of the crime.

Trammell was asked by the prosecutor on redirect examination whether the blood on the nightstand was back spatter from the shooting. Trammell attempted to testify regarding what the paramedic had told him about the origin of the blood on the nightstand. The defense objected based on hearsay. The State argued that Trammell was an expert and was entitled to rely on and testify regarding hearsay upon which he could have reasonably relied as an expert in forming his opinion. The defense argued that no foundation had been

---

[10] The defense characterizes Trammell's testimony as stating that the shooter was standing in front of the nightstand, such that any blood that spattered onto the nightstand would have also ended up splattered on the shooter. Trammell actually testified that the shooter was standing approximately next to the front right corner of the nightstand. However, Trammell testified he was unable to determine where exactly the shooter would have been in relation to the nightstand.

made as to the reasonableness of Trammell's reliance on the hearsay in forming his opinion. The objection was overruled.

Trammell was allowed to opine that the blood on the nightstand was not back spatter because a paramedic had told him that the blood resulted from the paramedics' attempt to put an IV into Sierra's arm. He also testified that the physical characteristics of the blood on the nightstand that suggested it resulted from "passive" or "90 degree" dripping rather than spatter. During cross-examination, Trammell agreed that he could not conclusively determine whether the blood on the nightstand was back spatter or was dropped from the paramedics' treatment of Sierra.

> A trial court "has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." [*State v. Hart*, 404 S.W.3d 232, 248 (Mo. banc 2013)]. "Reversal due to an evidentiary error requires a showing of prejudice." *State v. McFadden*, 369 S.W.3d 727, 736 (Mo. banc 2012) (quoting *State v. Taylor*, 298 S.W.3d 482, 492 (Mo. banc 2009)). If there is a reasonable probability that the trial court's error affected the outcome of the trial, there is prejudice. *State v. Clark*, 364 S.W.3d 540, 544 (Mo. banc 2012).

*State v. Hartman*, 488 S.W.3d 53, 56 (Mo. banc 2016).

"Hearsay statements, or out-of-court statements used to prove the truth of the matter asserted, generally are inadmissible." *Id*. at 57. However,

> [i]n recognition of the generally accepted principle that an expert acquires his knowledge and expertise from a number of sources, some of which may include inadmissible hearsay, an expert can rely on hearsay information in forming an opinion. An expert can rely on such information provided that those sources are not offered as independent substantive evidence, but rather serve only as a background for his opinion. Section 490.065.3 permits an expert to consider facts not in evidence in forming an opinion or inference, but a two-step approach must be used to determine the admissibility of that expert opinion. First, the facts or evidence must be of a type reasonably relied on by experts in the field in forming opinions or inferences on the

subject. Second, the trial court must independently decide if the facts and data relied on by the expert meet a minimum standard of reliability, i.e., are otherwise reasonably reliable.

*Whitnell v. State*, 129 S.W.3d 409, 416 (Mo. App. E.D. 2004) (internal citations omitted).

We need not consider whether the trial court erred in admitting the hearsay evidence regarding the origin of the blood found on the nightstand, as Levi cannot show he was prejudiced by the admission of that evidence.[11] First, Trammell testified that he could not conclusively determine the origin of the blood on the nightstand, lessening the force of his testimony regarding the hearsay. Second, Levi's claim of prejudice is premised on the assumption that the shooter was standing in front of the nightstand when Sierra was shot, such that any back spatter would have hit both the nightstand and the shooter. As explained above, the evidence was inconclusive as to the precise location of the shooter with relation to the nightstand. Third, in addition to Trammell's testimony regarding what the paramedic told him about the origin of the blood, Trammell also testified that, in his expert opinion, the blood on the nightstand was not back spatter due to the appearance of the blood, which suggested it was not spatter but rather was passive and dropped from a 90 degree angle. This expert testimony reinforces the conclusion the blood on the nightstand was not back spatter, irrespective of the hearsay testimony.

More importantly, the evidence against Levi was overwhelming. He was left alone with his sister and less than one hour later, upon the return of his parents, she was found

---

[11] Levi did not object to the testimony based on any alleged violation of the confrontation clause and makes no argument on appeal that the admission of this testimony violated his constitutional rights under the confrontation clause. As the claim was not raised before the trial court or raised or argued on appeal, we do not address this issue. *See State v. Nathan*, 404 S.W.3d 253, 271 n.12 (Mo. banc 2013) (claims that are neither preserved nor addressed will not be considered on appeal).

shot in head. There was no sign of forced entry into the house and nothing was stolen. Levi was familiar with the firearms in the home and had fled the scene in a pickup truck. He did not go to the police but went to Walmart where he walked around and talked nervously with employees for several hours. He developed an unbelievable story that after finding his sister shot in the bedroom, he was able to flee from the scene and evade the shooter in a car chase. He claimed that he only stopped at Walmart because he was running out of gas. Instead of calling the police or telling this tale to the employees at Walmart upon arrival to seek safety, he waited and evaded his parents, while his sister lay dying at home.

There is not a reasonable probability that the outcome of the trial would have been different had Trammell not been allowed to testify regarding what the paramedic told him about the origin of a drop of blood on the nightstand. Because Levi cannot show he was prejudiced by the admission of the hearsay, we need to consider whether its admission was error. *See State v. Steele*, 314 S.W.3d 845, 850 (Mo. App. W.D. 2010) ("[E]ven if the court finds hearsay evidence was improperly admitted, the conviction will be reversed only if defendant can prove both error and prejudice").

Point Two is denied.

## Conclusion

The judgment of the circuit court is affirmed.

_____
Gary D. Witt, Judge

All concur

13